IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| HAYMES BROTHERS, INC., | ) | Case No. 4:10CV00005 |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| RTI INTERNATIONAL METALS, INC., ET AL., | ) | |
| Defendants. | ) | By: Jackson L. Kiser<br>Senior United States District Judge |

Before me are Plaintiff's and Defendants' Proposed Findings of Fact and Conclusions of Law [ECF Nos. 54 and 53, respectively]. Plaintiff filed its Complaint [ECF No. 1] in the Pittsylvania County Circuit Court on December 28, 2009. Defendants removed the case to this court on February 1, 2010. I heard evidence at a bench trial held from May 9, 2011 through May 12, 2011, after which the parties filed their respective briefs. This matter is now ripe for review. For the reasons contained herein, the Court **ENTERS JUDGMENT IN FAVOR OF THE PLAINTIFF IN THE AMOUNT OF $1,087,266.23**.

I. Findings of Fact

Defendants RTI International Metals, Inc. and RTI-Martinsville, Inc. (hereinafter referred to jointly as "RTI") are together a United States based titanium manufacturer. Trial Tr. 5/10/11 at 120. RTI undertook construction of a titanium manufacturing facility on a ten-acre lot in the Patriot Center Industrial Complex (the "industrial park") in Henry County, Virginia. Trial Tr. 5/9/11 at 22; 5/10/11 at 119–20, 123. There are three main buildings in the RTI complex at the industrial park: the plate cell building, the "FC" building and a grinder building. Defs' ex. 155-1; Trial Tr. 5/11/11 at 91–93. Before construction on portions of the RTI complex could commence, a steep hillside in the industrial park required excavation and grading. Trial Tr. 5/11/11 at 94–95.

1

RTI initiated a competitive bidding process to find a contractor for the excavation project. Trial Tr. at 120–21. RTI sent identical packages of information to all prospective bidders. Joint exs. 1–8; Trial Tr. 5/11/11 96–97. The packages included geotechnical reports prepared by the engineering firms Schnabel Engineering and Hurt & Proffitt that pertained to the excavation site. *Id.* RTI solicited the project as a "classified" job, meaning the cost would be computed with unit pricing for each item of work. Trial Tr. 5/9/11 at 26–27; 5/10/11 at 6; 5/11/11 at 181–82.

The geotechnical reports included with the bid documents were created using borings—essentially small-diameter test holes drilled into the ground—that provided samples of the subsurface conditions. Joint ex. 4. The borings were drilled vertically into the ground and descended until the drill bit met "auger refusal," which is the point "when the auger refuses to turn any more under mechanical pressure . . . ." Trial Tr. 5/11/11 at 8. Every boring included in the geotechnical reports met auger refusal prior to reaching the project's finished grade. Joint ex. 4. Auger refusal could indicate that the drill impacted a large object, but it could also simply mean that the auger hit something "the size of a basketball." Trial Tr. 5/12/11 at 130. It logically follows that auger refusal does not provide conclusive evidence about subsurface conditions beneath the object encountered.

In addition to the borings, the geotechnical reports contained descriptions of possible subsurface conditions in lay terms. The report stated that some areas "may not be rippable using normal excavation equipment," that "hammering or blasting" may be required, and that "large boulders in the area are prevalent." Joint ex. 4. Yet the bid reports also contained phrases such as, "[i]f a contractor can move 10 ft. or larger boulders, then it may be possible to avoid blasting or hoe-ramming." Joint ex. 7.

Plaintiff Haymes Brothers, Inc. ("Haymes"), a site work and excavation company based in Chatham, VA, submitted a bid to perform RTI's excavation project on a classified basis for $5,090,000.00. Joint ex. 9; Trial Tr. 5/10/11 at 6. Haymes' bid was one of five or six RTI received. Trial

2

Tr. 5/11/11 at 107. Based on the competitiveness of Haymes' bid, RTI and Haymes entered into post-bid negotiations at Haymes' office in early May 2008. Trial Tr. 5/11/11 at 107–08.

At the May 2008 meeting, Joe Traina ("Traina"), RTI's engineering projects manager, and Thomas Goettge ("Goettge"), an independent consultant for RTI, represented Defendant. Trial Tr. 5/11/11 at 108. Chuck Haymes ("C. Haymes"), president of Haymes Brothers, Andy Haymes ("A. Haymes"), vice-president of Haymes Brothers, and Ricky Moorefield ("Moorefield"), Haymes Brother's project manager, represented Plaintiff at the meeting. *Id.* Also in attendance were two representatives from Henry County's Department of Engineering, Tim Pace ("Pace") and Jeff Turton ("Turton"). *Id.* The parties discussed numerous issues, including concerns about the subsurface conditions at the excavation site and Haymes' ability to meet RTI's project schedule. Trial Tr. 5/11/11 at 108–09.

According to Traina, the County officials stated that, based their experience with prior projects in the industrial park, subsurface conditions there were typically "rippable rock[1] at worst." Trial Tr. 5/11/11 at 174. C. Haymes testified that the County officials stated "that we probably wouldn't encounter much rock. In all of the work that they had done in the park, that they had seen very little rock; that there would be some boulders, but no substantial rock." Trial Tr. 5/10/11 at 8. Pace testified that "boulders" meant something in the realm of eight by twelve feet that "look like oversized dinosaur eggs." Trial Tr. 5/10/11 at 116. Traina did not voice any disagreements with the County officials' assessment of the general subsurface conditions in the area. Trial Tr. 5/11/11 at 181. Further, Traina testified that he would have raised concerns at the meeting if he had felt that the County officials' assessment was at odds with the geotechnical information contained in the bid documents. *Id.*

The parties also discussed the logistics of a "fill area" where the County would allow Haymes to dump the excavated material. Trial Tr. 5/9/11 at 29. The County had to approve the type of material that Haymes could dump in the fill area because the County had future plans to build on top of the fill.

---

[1] "Rippable rock" is subsurface material that can be excavated using conventional equipment and does not require drilling, blasting or hammering. Trial Tr. 5/9/11 at 93–94.

3

Trial Tr. 5/9/11 at 168. The parties did not plan for the possibility that Haymes would need to dump excavated material so large that it would be incompatible with the fill area's suitability for future building. Trial Tr. 5/9/11 at 40; 5/11/11 at 110.

Haymes and RTI were also worried about meeting RTI's schedule for the project, which C. Haymes described as "very aggressive." Trial Tr. 5/9/11 at 89. The concern was partially based on the logistics of meeting the schedule while still performing the contract on a classified basis. Trial Tr. 5/9/11 at 28, 96–97; 5/11/11 at 182. Classified jobs generally proceed more slowly than unclassified jobs because the parties must quantify and qualify the type of material being excavated. Trial Tr. 5/9/11 at 27; 5/11/11 at 181–82. Typically, the owner provides an on-site representative who confers with the contractor's field personnel on a daily basis to generate mutual figures regarding the excavated material in each truckload. Trial Tr. 5/9/11 at 27–28. As Moorefield testified:

> With the massive amount of equipment that we had on the site, running a 24-hour-day operation, imagine 10 to 12 of these haul units moving constantly on a 24-hour basis, you would literally have to have an inspector for each one of those vehicles to determine the type of material that was in it, record that, and then have everyone agree on that, and—which could lead to delays on the project, vehicles sitting still, which delays your schedule for that day.

Trial Tr. 5/9/11 at 28.

Soon after the May meeting and pursuant to the parties' concerns about the schedule, Moorefield contacted Traina and raised the possibility of unclassifying the project. Trial Tr. 5/9/11 at 28; 5/11/11 at 184. In an unclassified contract, the contractor is paid a lump-sum for all material removed and thus there is no need to confer with the owner's representative to mutually classify and price each load of excavated material. Trial Tr. 5/9/11 at 27. Goettge testified that he was "elat[ed]" at the potential transition from classified to unclassified "[b]ecause there was much less detailed recording of types of rock, quantities of rock, and methods of removal . . . ." Trial Tr. 5/12/11 at 32, 36. The obvious negative aspect of proceeding unclassified is that, instead of quantifying and pricing the excavated material as it is removed, the parties must negotiate a lump-sum contract price prior to the excavation

4

based on an approximation of the sub-surface conditions. Trial Tr. 5/9/11 at 31. Thus, there is increased risk that the negotiated pricing will be disproportionate to the amount of work performed should the subsurface conditions prove more difficult than estimated. Trial Tr. 5/9/11 at 31; 5/10/11 at 122–23.

After further negotiation, the parties agreed to proceed on an unclassified basis; RTI paid an increase of $800,000[2] for the change. Defs' ex. 107; Trial Tr. 5/11/11 at 107. Additionally, the "Scope of Work" section in the contract documents was amended to read as follows:

> **1.0 Scope of Work**
>
> CONTRACTOR shall furnish and pay for all labor, materials, supplies, services, tools, equipment, and utilities not furnished by OWNER to fully execute the Work described in this Contract in accordance with the plans and specifications and all contract documents. Such work is described as follows:
>
> 1. The Work includes sitework, earthwork, underground utilities and structures as further defined in the Contract Drawings, Specifications and other Contract Documents listed in Exhibit "B" of this Contract. Specifically, the Work includes the excavation of unclassified soils from the surface to specified final grade lines and CONTRACTOR, having examined the site and the geotechnical reference information and having made its own investigation of subsurface conditions, accepts that there are variations in the amount and location of the various types of soils and rock revealed by the bored samples. CONTRACTOR warrants that such variations in the amount and location of the types of soils and rock present have been considered in the Lump Sum Price proposed. Owners will grant an equitable adjustment in time and/or money only in the event that soils and rock of a type(s) different than those known to CONTRACTOR are encountered.

Joint ex. 10 at 1. The equitable adjustment clause was added after the parties decided to perform the work on an unclassified basis. Trial Tr. 5/9/11 at 33, 120–21; 5/10/11 at 49–50, 178–79; 5/11/11 at 196. Goettge drafted the equitable adjustment clause on RTI's behalf. Trial Tr. 5/12/11 at 15. In discussions

---

[2] The original contract was for $5,090,000. Joint ex. 9; Trial Tr. 5/10/11 at 6. The unclassified contract was for $6,000,000. Joint ex. 10 at 2. This would indicate a difference of $910,000. This figure is important in calculating damages. Notwithstanding the apparent increase of $910,000, both parties adopt the position that RTI paid $800,000 to unclassify the contract. Joint ex. 27; Defs.' Prop. Findings and Concls., 32 ("In essence, RTI paid $800,000 to unclassify the site, but received no additional excavation for its money . . . ."). Consequently, I will also adhere to the $800,000 figure.

with Moorefield contemporaneous with the drafting process, Goettge provided examples of conditions that would trigger an adjustment. Trial Tr. 5/12/11 at 16. "The two examples that [Goettge] gave were the encountering extremely large boulders that had not been noted . . . and also the effect of sand or mud seams which could not—were not reported in the geotechnical reports." *Id.* The parties executed the contract on May 28, 2008. Joint ex. 10 at 25.

Haymes began excavating in early June 2008, working six days a week in 12-hour shifts, 24-hours per day. Trial Tr. 5/9/11 at 33; 5/11/11 at 115. Haymes' progress was "excellent" through early August 2008. Trial Tr. 5/10/11 at 127–28. On August 1, 2008, however, Moorefield sent a letter to Goettge seeking an equitable adjustment under the contract. Joint ex. 11. In support of his request, Moorefield stated:

> We are currently encountering boulders on the site of a magnitude that could not be foreseen. These boulders are of the type and configuration that even when blasted must still be broken by hammering, and the combination of the two still does not reduce them to an acceptable size to be used in the fill areas.
>
> As we have already made you aware, we are rapidly running out of fill area as designed on the plans, and we are awaiting formal direction on this issue. Tim Pace and Jeff Turton have both been onsite on behalf of Henry County trying to find a solution to this issue. They both seem to agree that the material that is resulting from these boulders is not usable, especially in the upper areas of the fill.
>
> Although we accepted this site contract as unclassified, we feel that the previously stated [equitable adjustment] section applies and we have a valid request for the Owner to provide some monetary relief.

*Id.* Moorefield also requested a meeting with Goettge to "discuss this in depth . . . ." *Id.* Haymes stated that the reason that blasting was ineffective and the rock required subsequent hammering to further reduce its size was the presence of seams of sand and dirt interbedded between the rock formations. Trial Tr. 5/11/11 at 225. The seams absorbed energy from the blasts, thereby reducing the explosives' effectiveness in fracturing the rock. Trial Tr. 5/9/11 at 103–04. It took extensive effort to reduce the rock to a size suitable to place in a 40-ton off road truck—roughly four times the size of a traditional

6

dump truck. Trial Tr. 5/9/11 at 105. Moorefield testified that these conditions were pervasive through the bottom third of the excavation and that the project resembled a "moonscape" that was "a couple of football fields in length and width." Trial Tr. 5/9/11 at 35. Richard Burnsworth, vice-president of Douglas Explosives,[3] stated that he had not seen such rock formations in his more than twenty years of blasting experience. Trial Tr. 5/9/11 at 165–66, 175. Haymes stopped working 24-hour shifts after encountering the adverse conditions because, according to C. Haymes, "this material was difficult enough to deal with in the daytime; it was impossible to deal with at night." Trial Tr. 5/9/11 at 107.

The large quantity of rock in the excavation site also created problems relating to the County's fill area. The County would not accept the material that Haymes was excavating from the bottom portion of the site and RTI was forced to execute a change order on August 6, 2008 creating a new fill site. Trial Tr. 5/9/11 at 40–43; 5/10/11 at 184–86; 5/12/11 at 40; Pl.'s exs. 34, 35. The new fill site was further from the project than the old one, increasing transportation costs. Trial Tr. 5/9/11 at 40, 43; 5/12/11 at 40.

Upon receipt of Haymes' August 1 equitable adjustment request, RTI sought assistance from Hurt & Proffitt—one of the engineering firms that prepared the geotechnical reports included in the project's bid documents—to determine the validity of Haymes' equitable adjustment claim. Joint exs. 12, 13. After visiting the site, Hurt & Proffitt geologist Mike Neylon wrote to Traina, "[t]he rock observed was consistent with the rock encountered during our previously performed subsurface investigations . . . . We did not observe anything unanticipated during our visit." Joint ex. 15. On August 15, 2008, Richard R. Vandergrift ("Vandergrift"), RTI's vice-president of capital projects, denied Haymes' request for an equitable adjustment. Defs.' ex. 124. Vandergrift wrote, "[b]ased upon the stated information and upon the express language of our contract with Haymes, RTI is not obligated to contribute additional funds to remove a larger volume of rock than you expected." *Id.*

---

[3] Haymes' subcontractor on the project.

On August 20, 2008 the parties, represented by Vandergrift, Traina, C. Haymes and Moorefield, met on-site to discuss the problems with the project. Trial Tr. 5/9/11 at 45–46; 5/10/11 at 141–43; 5/11/11 at 125–27. Vandergrift reiterated his statement from the letter that additional volume of rock did not warrant an equitable adjustment, but that they would continue to review information relevant to Haymes' request. Trial Tr. 5/10/11 at 143. On September 2, 2008, Haymes sent RTI a report dated August 18, 2008 from Hillis-Carnes Engineering Associates, Inc. Defs.' ex. 132. Haymes retained Hillis-Carnes to review the site and offer its opinion regarding Haymes' entitlement to an equitable adjustment. *Id.* The report concluded, "[t]he lack of accurate rock information resulted in excavation costs that were far in excess of what could have been reasonably expected and the Contractor is entitled to an equitable adjustment to his bid price." *Id.* The parties continued on-and-off discussions of Haymes' claim through late 2009 without resolving their differences. Joint exs. 14, 16; Defs.' exs. 130, 132, 133, 140.

## II. Conclusions of Law

The contract allows for an equitable adjustment "only in the event that soils and rock of a type(s) different than those known to CONTRACTOR are encountered." Joint ex. 10. Thus, Haymes' entitlement to an equitable adjustment turns on the meaning of "soils and rock of a type(s) different than those known to CONTRACTOR." "Where parties contract lawfully and their contract is free from ambiguity or doubt, the agreement between them furnishes the law which governs them." *Russell Co. v. Carroll*, 194 Va. 699, 703 (1953). If, however, the language of the instrument is ambiguous, the Court may look to parol evidence in order to determine the intent of the parties. *Aetna Cas. and Sur. Co. v. Fireguard Corp.*, 249 Va. 209, 215 (1995). Mere disagreement among the parties to the contract does not render the instrument ambiguous. *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 116, 119 (2002). Instead, "Contract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'" *Eure v. Norfolk Shipbuilding & Drydock*

8

*Corp., Inc.*, 263 Va. 624, 632 (2002) (quoting *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 234 (1992)). "In construing every contract we should consider the relation of the parties, the objects to be accomplished, and the general circumstances attending its execution." *Cary v. Northwestern Mut. Life Ins. Co.*, 127 Va. 236 (1920). "As far as is possible, we should place ourselves in the position of the parties to the contract at the time it was executed." *Id.* Finally, "[i]t is a familiar legal maxim that ambiguous contractual provisions are construed strictly against their author." *Am. Realty Trust v. Chase Manhattan Bank, N.A.*, 222 Va. 392, 403 (1981).

I find that the word "type," as used in the equitable adjustment clause, is ambiguous because it "may be understood in more than one way . . . ." *Norfolk Shipbuilding*, 236 Va. at 632. "Type" could refer to classes of soil and rock, such as igneous, sedimentary or metamorphic rock or any of the various soil orders listed in the United States Department of Agriculture's *Soil Taxonomy, A Basic System of Soil Classification for Making and Interpreting Soil Surveys.*[4] "Type" could also refer to the quantity, structure and layout of rock and soil beneath the surface. Certainly rock and soil can be classified by their makeup, as in the examples provided above, but they can also be described by their structure. For example, Defendants' expert testified that dikes and sills are formational subsets of a pluton, which is itself a type of formation of igneous rock. Trial Tr. 5/12/11 at 88–89. A pluton is an intrusion of magma through cracks in bedrock, creating formations that can be miles in diameter; a dike is a vertical pluton and a sill is a horizontal pluton. *Id.* Thus, "type" could refer either to the composition of the subsurface materials or to the layout and quantity of the subsurface materials, or to both.

Because the word "type" is ambiguous, I must look to the parties' acts and interpretations surrounding the execution and performance of the instrument for guidance. *Federal Ins. Co. v. Starr Elec. Co.*, 242 Va. 459, 467 (1991). Two evidentiary points are determinative. First, at the initial meeting among representatives from Haymes, RTI and Henry County, the parties planned for a fill area to handle

---

[4] *Available at* ftp://ftp-fc.sc.egov.usda.gov/NSSC/Soil_Taxonomy/maps.pdf (last visited June 14, 2011).

9

all the material removed from the excavation site. Trial Tr. 5/9/11 at 29. No one at that meeting contemplated a situation where the excavated material would be of a *type* unsuitable for the requirements of the fill area. Trial Tr. 5/9/11 at 40; 5/11/11 at 110. In other words, no representative from RTI or Haymes voiced concern at a meeting conducted well after the parties had reviewed the geotechnical information that it was necessary to plan for material as large and difficult to manage as what was actually encountered.

Second, Goettge—RTI's representative who drafted the equitable adjustment provision—testified that he told Moorefield at the time of drafting that extremely large boulders interbedded with seams of sand and mud would justify an equitable adjustment. Trial Tr. 5/12/11 at 16. Thus, the person who drafted the equitable adjustment provision gave, as an illustration of a justifiable adjustment, the *exact conditions that were encountered*. Even without the general rule that ambiguous provisions are construed against the drafting party, this evidence would be detrimental to Defendants' case. Moreover, Goettge's testimony stands uncontroverted. Defendants' only argument against Goettge—a defense witness—is that he testified incorrectly[5]; they offer no contrary statements from other RTI representatives. Traina did testify that he believed the equitable adjustment clause could only be triggered if conditions were encountered "that disagree[d] with the geological information that we used to bid the job." Trial Tr. 5/11/11 at 227. But this is not inconsistent with Goettge's testimony if the geological information failed to disclose Goettge's example. Moreover, Vandergrift testified that no one from RTI ever contacted Haymes and stated, in any way, that Goettge's examples were incorrect and were not conditions that would trigger the equitable adjustment clause. Trial Tr. 5/10/11 at 223–24. Vandergrift also testified that he could not identify any information in the geotechnical reports that would have alerted Haymes to the possibility that they would encounter interbedded seams of sand and mud and monster-sized boulders. Trial Tr. 5/10/11 at 224. Based on the principles of law and the

---

[5] I was impressed with Goettge's testimony and found him to be a credible witness.

evidence discussed above, I am compelled to conclude that the equitable adjustment clause from the contract encompasses the exact conditions that Haymes encountered on the project.

I also find that the geotechnical information failed to put Haymes on notice that it would encounter the subsurface conditions at issue. While the reports did indicate the presence of subsurface rock, possibly large, and that hammering or blasting may be necessary, they also stated that there may be no boulders larger than ten feet and that conventional equipment may suffice. Joint exs. 4, 7. The reports did not convey the possibility of mass, continuous subsurface rock. Defendants point to language from the reports urging caution in quantifying the subsurface material that could be removed using conventional equipment and warning about the possibility of pinnacles of rock in the area. Joint ex. 7. This contention is unavailing. A report which states that difficult conditions may or may not be encountered, that blasting may or may not be necessary, and that large boulders may or may not be present is like a weatherman reporting that it may be hot but could snow, that it may be dry but could rain. Neither report warrants a conclusion that the recipient was on notice of whichever instance actually occurred.

Notwithstanding the inadequacy of the geotechnical reports, Defendants contend that Plaintiff is still not entitled to an equitable adjustment because Haymes failed to satisfy its contractual duty to investigate the subsurface conditions. The contract states:

> Specifically, the Work includes the excavation of unclassified soils from the surface to specified final grade lines and CONTRACTOR, having examined the site and the geotechnical reference information and having made its own investigation of subsurface conditions, accepts that there are variations in the amount and location of the various types of soils and rock revealed by the bored samples.

Joint ex. 10. Prior to executing the contract, Haymes visited the site twice and conducted its own exploratory drilling once.[6] Trial Tr. 5/9/11 at 88. Haymes also conferred with Henry County officials at

---

[6] Defendants point to Burnsworth's testimony that the test drilling revealed hard rock and "some dirt seams" as evidence that the conditions were known to Haymes prior to the excavation. Problematically, though,

11

the post-bid negotiation meeting regarding subsurface conditions. Trial Tr. 5/10/11 at 8. Further, Haymes had previously performed two excavation projects on sites "a half a mile to a mile" away from the project. Trial Tr. 5/9/11 at 89–90. Haymes was also familiar with other excavation jobs in the industrial park that they had bid on but not been awarded the contract. Trial Tr. 5/9/11 at 90. In summary, then, Haymes examined the site and the geotechnical information and made its own investigation of the subsurface, just as the contract required. The fact that Haymes "accep[ed] that there are variations in the amount and location of the various types of soils and rock revealed by the bored samples" does not bar the application of the equitable adjustment clause. Joint ex. 10. Such an interpretation would render the equitable adjustment clause—which falls just two sentences after the quoted excerpt—meaningless. In Virginia, "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D.C. McClain, Inc.*, *v. Arlington Cnty.*, 249 Va. 131, 135–36 (1995).

RTI also contends that Haymes is not entitled to an equitable adjustment because Haymes failed to comply with the contractual prerequisites to payment. Specifications incorporated into the contract require the contractor to provide certain information to the owner "[i]f latent or changed conditions require modifications to the Contract . . . ." Defs.' ex. 148 at HBR-102316. The Specifications require that the contractor include details such as the change in contract cost substantiated by data regarding quantities, changed labor costs and other associated expenses. *Id.* RTI claims that Plaintiff did not provide this information. This argument, though, suffers from a fatal flaw. Prior to the meeting on August 20, 2008—a meeting required under section 27 of the contract (Joint ex. 10)—Vandergrift denied Plaintiff's claim insofar as it was based on increased quantity of rock. Defs.' ex. 124; Vandergrift then reiterated his denial of the claim at the meeting. Trial Tr. 5/10/11 at 143. Vandergrift again

---

Burnsworth also testified that he had never encountered conditions like the bottom third of the project. Trial Tr. 5/9/11 at 165–66, 175. The fact that Burnsworth was unprepared for the encountered conditions despite conducting exploratory drilling corroborates Haymes' claim that the geotechnical reports were inadequate as well.

restated his belief at trial that the conditions Haymes encountered did not entitle them to and equitable adjustment. Trial Tr. 5/10/11 at 137. Specifically, Vandergrift affirmed his August 15th statement that "RTI is not obligated to contribute additional funds to remove a larger *volume* of rock than you expected." *Id.* (emphasis added). For years, then, RTI has maintained the position that the conditions Haymes encountered subsurface were problems related to increased *quantity* of rock. Similarly, RTI has maintained the position that the equitable adjustment clause does not apply to unexpected increases in the *quantity* of rock. Thus, RTI cannot avoid liability under the equitable adjustment clause by asserting that Haymes never provided it with *quantified* measurements of the conditions it encountered as required in the Specifications. As late as October 2009, RTI was still denying Haymes' claim but simultaneously asking for "total volumes, volumes per load." Defs. ex. 140. Based on RTI's August 15, 2008 letter and continued affirmation of the language contained therein, such a submission would have been useless as RTI had already denied any claim based on quantity/volume.

For the foregoing reasons, Haymes is entitled to an equitable adjustment under the contract. Haymes argues that it should be awarded an adjustment of $2,819,866. Joint ex. 27. This figure is the sum of Haymes' claim of $1,470,666 for blast rock, $313,200 for blast boulders, $1,507,500 for break boulders and $328,500 for additional rip rock, minus the $800,000 that RTI paid Haymes to unclassify the contract. *Id.*

Haymes' requested adjustment is excessive. Haymes' equitable adjustment should reflect only the costs associated with removing the material which justified the application of the equitable adjustment clause. The equitable adjustment clause was not meant to provide Haymes with a windfall; nor should any costs incurred prior to the discovery of the difficult conditions be part of the calculation.

Those guidelines necessitate that Haymes' profit margin and any expenses prior to August 1, 2008[7] be excluded from the equitable adjustment determination.

Haymes billed $7,366,611.75 for the entire RTI project. Defs.' ex. 141. The project cost Haymes $5,355,425.04. *Id.* Thus, Haymes' gross profit (billings minus direct expenses) on the project was $2,011,186.11, indicating a gross profit margin of 27% (2,011,186.11/7,366,611.75=.27). For the purpose of calculating Haymes' equitable adjustment, then, I will exclude a 27% profit margin ("pm") from the applicable figures. Plaintiff claims that its gross profit on the project did not include expenses such as equipment depreciation and administrative costs. Trial Tr. 5/10/11 at 43–44. Doubtless, Plaintiff does incur expenses not reflected in its direct billings. The burden of proof, however, is on Plaintiff to quantify these types of expenses. *See Shepherd v. Davis*, 265 Va. 108, 125 (2003) (noting that plaintiffs bear the "burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery"). Because Plaintiff has not met its burden regarding the claimed extra expenses, those items cannot be considered as a cost which would reduce Haymes' pm.

Haymes contends that it is entitled to $1,470,666 as compensation for the blast rock encountered on the project. Joint ex. 27. Haymes multiplied the total cubic yardage ("cy") of blast rock encountered on the project (85,265cy) by a unit price ("pu") of 17.25 (85,265cy x 17.25pu = $1,470,666). Haymes totaled the cy from Douglas Explosives' blasting reports from the entire project. Joint ex. 26; Trial Tr. 5/10/11 at 57–59. Haymes generated the pu from its price quotes in the original classified contract between RTI and Haymes that was never executed. Trial Tr. 5/10/11 at 25. Douglas Explosives charged Haymes $4.05pu for blasting the rock. Trial tr. 5/10/11 at 56–57. Haymes' figure is too high because the cy includes pre-August 1 blast rock and the pu includes Haymes' profit margin. Prior to

---

[7] August 1, 2008 is the date that Haymes requested the equitable adjustment. Joint ex. 11. Haymes likely encountered some adverse conditions prior to that date before it drew the conclusion that an adjustment was warranted. Lacking any other specific onset date, however, August 1 is the best guidepost for determining the adjustment amount.

August 1, Douglas blasted 30,862.9cy of rock. Joint ex. 26. Thus, the appropriate quantity of blast rock for the equitable adjustment is 54,393.1cy (85,265cy – 30,862.9cy = 54,393.1cy). Reducing the pu by 27% gives the appropriate multiplier of 12.59pu (17.25pu x .27pm = 4.66pm; 17.25pu – 4.66pm = 12.59pu). The correct calculation for the blast rock portion of Plaintiff's equitable adjustment is, therefore, 54,393.1cy x 12.59pu = **$684,809.13.**

Haymes contends that it is entitled to an equitable adjustment of $313,200 as compensation for blast boulders on the project. Joint ex. 27. Haymes multiplied 3,480cy (estimating 15cy per boulder) by 90pu to compute its claim. *Id.* Douglas Explosives, though, only charged Plaintiff a flat fee of $110 per boulder on a total of 232 boulders regardless of the boulders' size. Trial Tr. 5/10/11 at 61–62. Moreover, Douglas blasted 16 boulders prior to August 1. Joint ex. 25. Thus, Haymes' direct cost to Douglas for the blast boulders related to the equitable adjustment is $23,760 (110pu x 216 boulders = $23,760). The calculation must also include, however, Haymes' cost to remove the material from the site. To arrive at an appropriate pu for blast boulder debris removal, I first look to Haymes' pu from the blast rock. As discussed in the preceding paragraph, 12.59pu was appropriate for blast rock removal. That number, though, includes Douglas's charge to Haymes of $4.05pu for the actual blasting. Trial tr. 5/10/11 at 56–57. Because Douglas's expenses have already been accounted for in the blast boulder calculation, the appropriate debris removal figure for blast boulders is 8.54pu (12.59pu – 4.05pu = 8.54pu). Applying a 15cy estimate, which I find fair and reasonable, to the 216 post-August 1 blast boulders, I find that Haymes' debris removal costs were $27,669.60 (216 boulders x 15cy = 3,240cy; 8.54pu x 3,240cy = $27,669.60). The correct calculation for the blast boulder portion of Plaintiff's equitable adjust is, therefore, $23,760 blast costs + $27,669.60 haul costs = **$51,429.60**.

Haymes contends that it is entitled to an equitable adjustment of $1,507,500 as compensation for all boulders hammered ("break boulders") on the project. Joint ex. 27. To arrive at that figure, Haymes used the production schedule from a comparable piece of equipment to the hammer used on

15

the project, took the low end of the production range (250cy per shift) and multiplied it by the number of shifts Haymes hammered on the project: 67. Joint ex. 27; Defs.' ex. 136; Trial Tr. 5/10/11 at 33–39. Haymes then multiplied 16,750cy (250cy per shift x 67 shifts = 16,740cy) by 90pu to reach its figure of $1,507,500. This figure must be reduced because it includes profit margins in the pu and pre-August shifts in the cy. Defs.' ex. 136; Trial Tr. 5/10/11 at 25. According to the site records, Haymes hammered rock for 30 shifts prior to August 1. Defs.' ex. 136. Thus, 30 shifts should be removed from the cy calculation, meaning the appropriate figure would be 250cy x 37 shifts. However, another change to the cy calculation is warranted. Haymes used the low end of a production scale that ranged from 250cy to 900cy per shift "in an effort to be conservative, to give RTI the benefit of the doubt . . . ." Trial Tr. 5/10/11 at 39. It is undisputed, however, that Haymes' productivity throughout the project was high. Trial Tr. 5/9/11 at 34. Further, the production schedule assumes eight-hour shifts, whereas Haymes' shifts were typically 11 hours or more. Trial Tr. 5/10/11 at 33–39; Defs.' ex. 136. Thus, I find that 375cy per shift more accurately represents Haymes' work and the appropriate figure is, therefore, 13,875cy (375cy x 37 shifts). Finally, Haymes' 90pu rate must be reduced by 27% to 65.7pu (90pu x .27 = 24.3; 90pu – 24.3pm = 65.7pu). Thus, the correct calculation for the break boulder portion of Plaintiff's equitable adjustment is 13,875cy x 65.7pu = **$911,587.50**.

Haymes contends that it is entitled to an equitable adjustment of $328,500 for additional rip rock encountered on the project. Joint ex. 27. Haymes' surveyor performed a cross section of the site to quantify the material left to be excavated in early August 2008. Trial Tr. 5/10/11 at 41. Haymes then subtracted that number from the total amount of material left to be excavated on the project (which avoided double counting the blast rock, blast boulders and break boulders), leaving them with a figure of 73,000cy. Trial Tr. 5/10/11 at 41–43. Haymes multiplied the 73,000cy of additional rip rock by 4.50pu, which is the rippable rock pu from the original classified contract. Trial Tr. 5/10/11 at 25. Because the survey was taken in early August, the cy is correct and does not need to be reduced. The

16

4.50pu must be reduced by 27%, though, providing the correct multiplier of 3.28pu (4.5pu x .27 = 1.22; 4.5 – 1.22 = 3.28). Therefore, the correct calculation for the additional rip rock portion of Plaintiff's equitable adjustment is 73,000cy x 3.28pu = **$239,440**.

Based on the above discussion, Plaintiff's total equitable adjustment calculation is **$684,809.13 + $51,429.60 + $911,587.50 + $239,440 - $800,000 = $1,087,266.23**. Plaintiff is, therefore, entitled to an equitable adjustment under the contract of **$1,087,266.23**.

III. Conclusion

For the reasons set out above, the Court hereby **ENTERS JUDGMENT IN FAVOR OF THE PLAINTIFF IN THE AMOUNT OF $1,087,266.23**. The judgment shall bear interest at the rate of 0.18% from the date of entry until it is paid in full.

The clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

ENTERED this 17th day of June 2011.

                                                                  s/Jackson L. Kiser
                                                                  Senior United States District Judge